1   PHILLIP A. BAKER, BAR ID #169571
    pbaker@bknlawyers.com
2   DERRICK S. LOWE, BAR ID #267998
    dlowe@bknlawyers.com
3   JENNIFER L. STONE, BAR ID #325493
    jstone@bknlawyers.com
4   BAKER, KEENER & NAHRA, LLP
    633 West 5th Street, Suite 5500
5   Los Angeles, California 90071
    Telephone: (213) 241-0900/Facsimile: (213) 241-0990
6
7   MARCI LERNER MILLER, BAR ID # 162790
    marci@milleradvocacy.com
8   CHRISTINA N. HOFFMAN, BAR ID #161932
    choffman@milleradvocacy.com
9   MILLER ADVOCACY GROUP
    1303 Avocado Avenue, Suite 230
10  Newport Beach, California 92660
    Telephone: (949) 706-9734/Facsimile: (949) 266-8069

11  Attorneys for Plaintiffs

12                  UNITED STATES DISTRICT COURT

13       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| 14  Plaintiff J.P. on behalf of her minor son R.P., and all others similarly situated; | Case No.:  2:20-cv-04502 |
| 15  THE NATIONAL CENTER FOR FAIR & OPEN TESTING doing business as | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| 16  FAIRTEST, a Massachusetts corporation; A.K., individually and on | |
| 17  behalf of all others similarly situated; R.G. on behalf of her minor son J.G., and | **[Motion to Stay Litigation Under 9 U.S.C. ¶ 3]** |
| 18  all others similarly situated; Plaintiff M.S. on behalf of her minor daughter | |
| 19  Z.S., and all others similarly situated, | **Date:  November 2, 2020** |
| 20              Plaintiffs, | **Time: 1:30 p.m.** **Judge Philip S. Gutierrez** |
| 21  vs. | **Courtroom: 6A** |
| 22  EDUCATIONAL TESTING SERVICES (ETS), a New York corporation; | **[Concurrently filed with Objections to Declaration of James A. Clewley;** |
| 23  THE COLLEGE ENTRANCE EXAMINATION BOARD, a New York | **Declarations of A.K., A.S., C.M., D.K., J.G., L.B., M.W., N.C., R.P.,** |
| 24  corporation, doing business as THE COLLEGE BOARD; and | **Z.S., Derrick S. Lowe, Jay Rosner, Marci Miller, and Bob Schaeffer]** |
| 25  DOES 1 through 50, inclusive, | |
| 26              Defendants. | |

27

28  ///

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

# **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

1.   INTRODUCTION ...........................................................................................1

2.   STATEMENT OF FACTS ...............................................................................3

  A. The AP Exam is Distinct From College Admissions Exams.............................3

  B. The 2020 AP Exams.........................................................................................3

3.   ARGUMENT ...................................................................................................5

  A. College Board Has Not Met Its Burden of Proof............................................5

    i.   Disabled Plaintiffs did not agree to arbitration.................................6

    ii.  Charter Plaintiffs did not agree to arbitration.................................7

    iii. FairTest did not agree to arbitration ...............................................9

  B. Plaintiffs Disaffirm And Did Not Agree To The My AP Terms .........................9

    i.   The purported "My AP Terms" are disaffirmed..................................9

    ii.  Student Plaintiffs did nto agree to the My AP Terms..........................10

  C. There Was No Agreement To the AP Exam Terms...........................................12

    i.   The AP Exam Terms lack consideration ............................................12

    ii.  There was no assent to the AP Exam Terms ......................................13

    iii. The AP Exam Terms were the result of "stealth" tactics ..................16

  D. There Is No Enforceable Delegation Clause....................................................17

    i.   The alleged delegation clause is procedurally unconscionable ..................19

    ii.  The alleged delegation clause is substantively unconscionable ..................20

  E. The AP Exam Terms Are Unenforceable..........................................................21

    i.   The AP Exam Terms are void against public policy ...................................21

    ii.  The AP Exam Terms are procedurally unconscionable ...............................22

    iii. The AP Exam Terms are substantively Unconscionable...............................22

    iv.  The AP Exam Terms were presented through undue influence ...................23

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

F. Mr. Clewley's Testimony is Disputed by Plaintiffs ...............................................24

4.   CONCLUSION....................................................................................................25

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajamian v. CantorCO2e, LP,*
   203 Cal.App.4th 771 (2012) ...................................................................19

*Alaska Packers Ass'n. v Domenico,*
   117 F. 99 (9th Cir. 1902) ......................................................................13

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
   24 Cal.4th 83 (2000) .............................................................................18

*Automatic Vending Co. v. Wisdom,*
   182 Cal.App.2d 354 (1960) ...................................................................12

*Berg v. Traylor,*
   148 Cal.App.4th 809 (2007) ..................................................................10

*Bleecher v. Conte,*
   29 Cal.3d 345 (1981) .............................................................................12

*Campos v. Bluestem Brands, Inc.,*
   *2015 WL 5737601* (Dist. Ct. Oregon, 2015)..........................................25

*Capili v. Finish Line, Inc.,*
   116 F.Supp.3d 1000 (N.D.Cal. 2015) ....................................................21

*Card v. Wells Fargo,*
   2020 WL 1244859 ...................................................................................5

*Celli v. Sports Car Club of Am., Inc.,*
   29 Cal.App.3d 511 (1972) ......................................................................10

*Colgate v. Juul,*
   428 F.Supp.3d 728 (2019) ......................................................................15

*Comer v. Micro, Inc.,*
   436 F.3d 1098 (9th Cir. 2006) .................................................................5

*First Options of Chic, Inc. v. Kaplan,*
   514 U.S. 938 (1995) ...............................................................................21

*Fitz v. NCR Corp.,*
   118 Cal.App.4th 702 (2004) ..................................................................20

*Grabowski v. Robinson,*
   817 F.Supp.2d 1159 (S.D.Cal. 2011)......................................................21

- iii -

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

*Gutierrez v. Carter Bros. Sec. Services, LLC*,
  63 F.Supp.3d 1206 (E.D.Cal. 2014)........................................................23

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...........................................................................9

*In Re Henson*,
  869 F.3d 1052 (9th Cir. 2017) ...............................................................5

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)............................................................................17

*Kilgore v. KeyBank, Nat'l Assn*,
  718 F.3d 1052 (9th Cir. 2013) ...........................................................5, 19

*Knutson v. Sirius XM Radio Inc.*,
  771 F.3d 559 (9th Cir. 2014) .................................................................5

*Lima v. Gateway, Inc.*,
  886 F.Supp.2d 1170 (C.D.Cal.2012) ......................................................20

*Long v. Provide Commerce, Inc.*,
  245 Cal.App.4th 855 (2016) ................................................................14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...........................................................................9

*Mattei v. Hopper*,
  51 Cal.2d 119 (1958) ........................................................................12

*McGill v. Citibank NA*,
  2 Cal.5th 945 (2017) .........................................................................21

*McGovern v. U.S. Bank N.A.*,
  2020 WL 4582687 ...........................................................................21

*Mitchell v. HCL America, Inc.*,
  190 F.Supp.3d 477 (E.D.N.C. 2016).......................................................21

*Mohamed v. Uber Technologies, Inc.*,
  848 F.3d 1201 (9th Cir. 2016) ..............................................................18

*Nagrampa v. MailCoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006) ..............................................................19

*Nat'l Fed'n of the Blind v. The Container Store, Inc.*,
  904 F.3d 70 (1st Cir. 2018)...................................................................7

*Nguyen v. Barnes & Nobles Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ..........................................................6, 14

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

*Norcia v. Samsung Telecomms. Am., LLC*,
  2014 WL 4652332 (N.D. Cal. 2014), *aff'd Norcia v. Samsung Telecomms. Am.,
  LLC*, 845 F.3d 1279 (9th Cir. 2017) ..................................................................16

*Odorizzi v. Bloomfield School Dist.*,
  246 Cal.App.2d 123 (1966) ............................................................................24

*Peleg v. Neiman Marcus Grp., Inc.*,
  204 Cal.App.4th 1425 (2012) ..........................................................................8

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010) ..........................................................................20

*Scollan v. Gov't Emps. Ins. Co.*,
  222 Cal.App.2d 181 (1963) ............................................................................10

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)..........................................................................................9

*Sparks v. Sparks*,
  101 Cal.App.2d 129 (1950) ............................................................................10

*Specht v. Netscape Communications Corp.*,
  306 F.3d 17 (2nd Cir. 2002)......................................................................13, 14

*State Farm Gen. Ins. Co. v. Watts Regulator Co.*,
  17 Cal.App.5th 1093 (2017) ............................................................................8

*Sugouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ........................................................................14

*Swift v. Zynga Game Networks, Inc.*,
  805 F.Supp.2d 904 ..........................................................................................15

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Company, Inc.*,
  925 F.2d 1136 (9th Cir. 1991) ..........................................................................5

*Tompkins v. 23andMe, Inc.*,
  2014 WL 2903752 ..........................................................................................18

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ..........................................................................9

*Vernon v. Qwest Communications International, Inc.* (D. Colorado 2012) ..................15

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
  25 Cal.App. 3d 987 (1972) ............................................................................16

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

**Statutes**

9 U.S.C. § 3 ...............................................................................................................2

29 U.S.C. § 794d ......................................................................................................7

42 U.S.C. § 12189 ....................................................................................................7

ADA .........................................................................................................................7

*Cal. Family Code § 6700* ........................................................................................9

*Cal. Family Code § 6710* ......................................................................................10

California Government Code § 7405 ........................................................................7

Federal Arbitration Act ............................................................................................5

Federal Code Title 36 pt. 1194 ................................................................................7

Federal Rehabilitation Act of 1973 § 508 ...............................................................7

**Court Rules**

Rule 14, subsec. (a), and (vi) ................................................................................20

Rules (v) ................................................................................................................20

**Other Authorities**

28 C.F.R. § 36.309 ...................................................................................................7

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.    INTRODUCTION.**

Thirty minutes.

This was all the time that dedicated students across the world were given to log-in and prepare to take the 2020 Advanced Placement Exams ("AP Exam(s)") online. When this countdown began ticking ominously away at the bottom of their screens, these same students were expressly warned that they could not receive any aid during the exam and defendant the College Entrance Examination Board (the "College Board") threatened that, if they received any help, their scores would be canceled, they would be reported to their schools and all college admissions offices, they would be banned from future College Board examinations, including the SAT, and anyone who helped them would be investigated.  Students were thereby isolated from their parents or trusted adults as they tried to engage with the pre-test process.

After logging in, students had exactly these thirty minutes to complete a series of administrative tasks they were seeing for the first time.  After finishing these tasks they could then either click on a small box to proceed with the AP Exam or, if there was any time left, they could choose to click on a small, inconspicuous link that appeared near the box – a hyperlink to the purported terms for the AP Exam (the "AP Exam Terms"). While students were not required to click on the hyperlink, they were still required to click the small box in order to proceed with the AP Exam.  Students with disabilities were not given any extra time, breaks, or accessibility assistance during the countdown.

If students happened to click the hyperlink for the AP Exam Terms, they were ambushed with nearly 200 pages of legalese, spread through numerous additional hyperlinks.  Once they reached the <u>eighth</u> of those separate hyperlinks, students would find the American Arbitration Association ("AAA") website.  There they were expected to search the website, find the AAA Consumer Arbitration Rules, and read, understand, and agree to all <u>forty-five</u> (45) pages of those rules, then find and read all <u>thirty-three</u> (33) pages of the AAA Due Process Protocol referenced and incorporated within the

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

AAA Consumer Arbitration Rules.  All of this within a mere thirty-minute time period, even for students who College Board knew required extra time, extra breaks, or assistive technology to accomplish any tasks related to the AP Exams.  The law is clear that surprising students with nearly two hundred pages of legalese while the clock ticked away on test day was a metaphorical gun to their heads, not an enforceable arbitration agreement as Defendants claim.

This lawsuit is brought on behalf of millions of students who were forced to take the AP Exams at home during the COVID-19 pandemic under the above conditions. This lawsuit is also brought on behalf of possibly a million more students who were unable to even access the AP Exams at all because of (a) their disabilities or special needs, (b) their remote location or home environment, (c) their status as a homeschooler, charter school student, or non-test approved school, or (d) their lack of technological platforms or digital access.

Defendants College Board and Educational Testing Services ("ETS"), collectively "Defendants," are so desperate to avoid appearing before a jury that they claim that even these students, who could not take the AP Exams, let alone access the AP Exam Terms, are nonetheless bound by them.  Moreover, the College Board tries to minimize the role of plaintiff The National Center For Fair & Opening Testing ("FairTest"), a public charity that has its own claims and damages separate from the test takers and that never agreed to arbitrate any claims with the College Board.

All of this so that College Board could keep the over $500 million of revenue it planned to collect.

Thus, both the individually named students, on behalf of themselves and on behalf of those similarly situated (the "Student Plaintiffs"), and FairTest, collectively the "Plaintiffs," respectfully request that the Court deny the Motion to Compel Arbitration and Stay Litigation Under 9 U.S.C. § 3 (the "Motion") and allow this matter to proceed to trial where a jury can render a verdict on Defendants' misconduct.

///

## 2. STATEMENT OF FACTS.

### A. The AP Exam is Distinct from College Admissions Exams.

The Advanced Placement Program ("AP Program") is the closest thing to a "national" curriculum in the U.S.  College Board dictates course materials and content and provides practice exam materials for every AP course across the country, all of which it designs, with a focus on AP Exams, which it administers.  Students who pass their AP Exams with a 3, 4, or 5 can earn college credits, save thousands of dollars in tuition, and may even graduate college early.  Because of the high stakes involved in AP Exams, all possible measures are taken to ensure that qualified students enroll in the AP Program and that all AP students take AP Exams[1].

One thing is clear: there is no negotiation with College Board when it comes to signing up for or taking AP Exams.  Unlike the SAT or ACT, students cannot select the test date or location of the exam, nor do they have the choice between having the AP Exams administered by any company other than the College Board.  **[Declaration of Marci Milller ("Miller Decl."), ¶ 2]**.

Because of the AP Program's unique ability to provide access by students of different income levels to a consistent curriculum, the AP Program is funded by state, federal, and local governments.  **[Miller Decl., ¶¶ 2-8]**.

### B. The 2020 AP Exams.

When schools closed for in-person instruction due to the coronavirus pandemic, AP coordinators had already placed their orders for the AP Exams, and these orders could not be modified.  Schools could no longer administer AP Exams in the classroom, but College Board had already collected commitments for AP Exam fees worth hundreds of millions of dollars.  **[Miller Decl., ¶¶ 12-14 and Exh. A]**.  It chose to quickly change the format and structure of the AP Exams to an online, at-home format[2].

---

[1] See "Connect to AP": https://collegereadiness.collegeboard.org/about/benefits/connect-to-ap; "What is AP?": https://apstudents.collegeboard.org/what-is-ap

[2] College Board Coronavirus Updates: https://apcoronavirusupdates.collegeboard.org/educators

899-5656-000T

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

The acts and omissions of College Board in administering the AP Exams in an online, at-home format, as well as its subsequent steps, or lack thereof, are well-documented in the First Amended Complaint.  **[See Declaration of Derrick S. Lowe ("Lowe Decl."), ¶ 7 and Exh. "C," the First Amended Complaint ("FAC"), ¶¶ 52-84]**.

In view of the significant liability exposure created by its poor preparation, College Board attempted to force one-sided arbitration terms on students in the AP Exam Terms (the "Second Arbitration Clause").  The AP Exam Terms consisted of (a) eleven pages of terms and conditions, (b) further materials contained in eight separate hyperlinks to different parts of the College Board's website, most of which then further linked to additional pages or .pdfs on the website, and a government website, and (c) a ninth separate hyperlink to the AAA website with reference to the forty-five pages of the AAA Consumer Arbitration Rules, which in turn internally reference the thirty-three pages of the AAA Due Process Protocol, for a total of nearly two hundred pages of terms and conditions.  **[Lowe Decl., ¶¶ 3-6 and Exhs. "A" and "B"]**.

College Board attempted to impose these AP Exam Terms on students after warning that they could not receive any aid during the exam.  If students received any help College Board would cancel their scores, report them to their schools and all college admission offices, ban them from future examinations, and anyone who helped them would be investigated.  **[Declaration of James A. Clewley, Jr. ("Clewley Decl."), ¶ 13 and Exh. 2]**.  Students were only allotted thirty minutes, which appeared as a ticking clock counting down on their screens, in which to log-in for the AP Exams.  **[Clewley Decl., ¶ 10]**.  Students with special needs were not given any extra assistance or time with the AP Exam Terms.  **[Declaration of C.M. ("C.M."), ¶ 5; Declaration of M.W. ("M.W."), ¶¶ 4-10; Declaration of N.C. ("N.C."), ¶¶ 6-8, 13-14]**.

Despite purporting to compel students to waive numerous rights, the AP Exam Terms gave no additional benefits to the students in exchange for their agreement as College Board already had the obligation to administer the AP Exams.  **[Miller Decl., ¶¶ 13 and Exh. A]**.

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

3.     **ARGUMENT**.

   A.     **College Board Has Not Met Its Burden of Proof.**

   Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.  *In Re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017).  "Whether a valid agreement to arbitrate exists" is the first step in deciding a motion to compel arbitration under the Federal Arbitration Act.  *Kilgore v. KeyBank, Nat'l Assn*, 718 F.3d 1052, 1058 (9th Cir. 2013).  In making this inquiry, there is no thumb on the scale in favor of finding an arbitration agreement exists – that is, the "liberal federal policy regarding the scope of arbitrable issues is inapposite" to the question of "whether a particular party is bound by the arbitration agreement."  *Comer v. Micro, Inc.*, 436 F.3d 1098, 1104 n. 11 (9th Cir. 2006).

   The party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by the preponderance of the evidence.  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).  In determining whether a party has assented to arbitration, the Court "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise."  *Three Valleys Mun. Water Dist. v. E.F. Hutton & Company, Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991).  "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement."  *Id.*  "If there is doubt as to whether such an agreement exists," arbitration must be denied.  *Id.*  *See also Card v. Wells Fargo,* 2020 WL 1244859 at *7 (district court declined to compel arbitration after finding that "there is a genuine dispute of material fact regarding whether a valid arbitration agreement exists").

   In this case, as described in the concurrently filed Objections to Declaration of James A. Clewley, Jr. ("Mr. Clewley"), Defendants[3] have failed to meet this burden of proof with respect to any of the Plaintiffs in this case.  As discussed below, their

---

[3] ETS has identified no basis to compel arbitration nor do Defendants make any credible argument that ETS is a part or third-party beneficiary to either of the two agreements identified by College Board.

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

attempts to meet their burden of proof are particularly lacking relative to Student Plaintiffs who were disabled ("Disabled Plaintiffs"), Student Plaintiffs who were homeschooled or in charter schools ("Charter Plaintiffs"), and FairTest.  Before turning to arguments applicable to all Plaintiffs in this matter, this Opposition will first address these three special situations.

### i. Disabled Plaintiffs did not agree to arbitration.

Plaintiffs C.M., M.W., N.C., and A.K. were unable to access the AP Exams and/or the AP Exam Terms because College Board failed to meet basic accessibility standards.  Since no accommodations were made to assist Disabled Plaintiffs with additional time, in an alternative format, or with assistive technology, College Board failed to comply with its obligations to provide reasonable accommodations.  **[C.M., ¶¶ 3-5; M.W., ¶¶ 4, 5-8; N.C., ¶¶ 6-9; Declaration of A.K. ("A.K."), ¶ 5]**.

For example, College Board was well aware that substantially more time beyond thirty minutes would be needed to read the lengthy AP Exam Terms.  **[C.M., ¶¶ 4-5]**.  Yet students such as Plaintiff M.W., who had a pre-approved accommodation for breaks every ten minutes based on her brain injury, were not provided any breaks.  **[M.W., ¶¶ 4-7]**.  College Board knew such students would not be able to access the AP Exam Terms, especially under time-pressured conditions but provided no help.  **[Declaration of Jay Rosner ("Rosner Decl.), ¶ 26 and Exh. "E"]**.  And color-blind students such as Plaintiff N.C. were forced to view the AP Exam Terms in an inaccessible format in that the links, only differentiated by color (as opposed to size, location, or appearance), were indistinguishable from the remainder of the text.  As such, for color blind students like Plaintiff N.C. there was, quite literally, no indication a hyperlink existed, noting that conspicuous hyperlinks are an indispensable element of notice in online contracts under California law and, without notice, there can be no agreement.  *Nguyen v. Barnes & Nobles Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).  And still other students were unable to access screen-reading software which they were required to purchase on their own, and no MP3 or audio accommodations were offered.  **[Miller Decl., ¶¶ 16-21]**.

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

Thus, the AP Exam Terms failed to meet the minimum accessibility standards required by the ADA and its implementing regulations, 42 U.S.C. § 12189, 28 C.F.R. § 36.309.  **[Miller Decl., ¶ 21]**.  The AP Exam Terms also failed to meet the California Department of Education's web accessibility standards under California Government Code § 7405, which requires all governmental entities, schools and their contractors to comply with the accessibility requirements of Section 508 of the Federal Rehabilitation Act of 1973, as amended (29 U.S.C. Sec. 794d), and regulations implementing that act as set forth in Part 1194 of Title 36 of the Federal Code of Regulations.

Ironically, although many of these students were unable to access the AP Exam Terms, let alone reach the end, the AP Exam Terms concluded with the following:

> "If you have difficulty accessing these Terms and Conditions, including our policies and requirements, please contact AP Customer Service at 888-225-5427 (+1-212-632-1780 internationally) or email apstudents@info.collegeboard.org in advance of registering for or taking the AP Exam."

As in *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 83 (1st Cir. 2018), this case is devoid of any evidence that the AP Exam Terms were assented to by the Disabled Plaintiffs due to the failure to make accommodations: "It is undisputed that the in-store plaintiffs had no way of accessing the terms of the loyalty program, including the arbitration agreement, that appeared on the touch screen. And it is uncontradicted that no store clerk actually informed them that an arbitration agreement existed as a condition of entering the loyalty program."  *Id.* at 83.  Accordingly, no agreement to arbitrate could have been formed with the Disabled Plaintiffs.

### ii.   Charter Plaintiffs did not agree to arbitration.

Plaintiffs A.K., L.B., and Z.S. represent Charter Plaintiffs, students who were unable to take their AP Exams because their schools were not authorized test sites. **[Miller Decl., ¶ 22]**.  Prior to COVID-19, Charter Plaintiffs had to find a test site on their own to take the AP Exams.  Access to AP Exam test sites has always been challenging for this class of students, but with the closures of campuses across the country, access was impossible.  **[A.K., ¶ 5; Declaration of L.B. ("L.B."), ¶ 5;**

**Declaration of Z.S. ("Z.S."), ¶ 3]**.  These students did not and could not have entered into the first agreement referenced by Defendants in their Motion (the "My AP Terms") as their home or online schools were not permitted to administer AP Exams.

For example, Plaintiff A.K. did not participate in the AP Program during the relevant time period, so he could not have signed the My AP Terms **[A.K., ¶¶ 3-4]** and Plaintiff L.B. did not register for his AP exam electronically either, nor was he permitted to take his AP Exam at the school where he took his AP course.  **[L.B., ¶¶ 4-6, 7]**.  These declarations contradict Mr. Clewley's claim that they signed the My AP Terms.  And it is apparent that, since Charter Plaintiffs did not actually take the AP Exams, they never agreed to the AP Exam Terms either.  Thus, no agreement to arbitrate was formed with any of the Charter Plaintiffs[4].

A similar issue also exists as to Student Plaintiffs who were able to register for an exam but could not actually take it on the registered date.  For example, Plaintiff M.W. did not take the first AP Biology exam on her registered date of May 18, 2020 because College Board told her that she would not be eligible for pre-approved accommodations. **[M.W., ¶¶ 6-10]**.  Her claim therefore accrued on May 18, 2020.  Yet College Board claims she is required to arbitrate because of a purported agreement to the AP Exam Terms on June 4, 2020, the day of her AP Statistics Exam.  **[Clewley Decl., ¶ 17]**.  For these students, and others whose first exams were unsuccessful, the AP Exam Terms cannot be legally imposed on them if they were agreed to <u>after</u> the claims accrued.  The critical point in time in determining whether an arbitration agreement applies to claims is when the claims accrued, not when the plaintiff files his or her judicial complaint. *State Farm Gen. Ins. Co. v. Watts Regulator Co.*, 17 Cal.App.5th 1093, 1100 (2017); *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal.App.4th 1425, 1458 (2012).

---

[4] As discussed below with respect to FairTest, Plaintiffs submit that considerations of equity call for providing Disabled and Charter Plaintiffs with relief through the court system and weigh against a stay of their claims in the event any portion of the proposed class is required to arbitrate their claims.  The inability to successfully take the AP Exams has already injured and will continue to injure these students and they would therefore be prejudiced if forced to wait further for relief.

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

### iii.  FairTest did not agree to arbitration.

FairTest did not sign any contracts, let alone any arbitration agreements, with Defendants.  Moreover, FairTest does not derive its status as a plaintiff as a third-party beneficiary of either the My AP Terms or the AP Exam Terms as Defendants incorrectly asserts; rather, FairTest is an organizational plaintiff with its own causes of action.  **[Declaration of Bob Schaeffer ("Schaeffer Decl."), ¶¶ 1-3, 10-11]**.

Where an organization demonstrates sufficient injury to itself that is fairly traceable to the challenged action of the defendant and likely to be redressed by the requested relied, such an organization has standing to sue.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Types of recoverable injuries include economic harm, injury to an organization's reputation, diminution of financial support and membership, and interference with organizational activities.  *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376-377 (1982); *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972).  Courts usually frame the economic harm analysis as a two-part test in which an organization must show a drain on its resources from both (1) a diversion of its resources and (2) frustration of its mission.  *See e.g., Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018-1019 (9th Cir. 2013).

A review of the FAC makes clear that FairTest made no factual allegations of a contract against Defendants.  FairTest had to divert substantial resources to address and advocate against the College Board's gross mishandling of the AP Exams on behalf of the students at large.  **[FAC, ¶¶ 67, 116-122; Schaeffer Decl., ¶¶ 10-11]**.  FairTest suffered injury by diverting significant resources as a result of College Board's grossly negligent and discriminatory administration of the AP Exams this year.  **[FAC, ¶ 123]**.  Such injuries, and redress for these injuries, are not subject to any arbitration agreement.

### B.  <u>Plaintiffs Disaffirm And Did Not Agree To The My AP Terms.</u>

### i.  The purported "My AP Terms" are disaffirmed.

In California, a minor has the right to enter into a contract, subject to a statutory right of disaffirmance.  *Cal. Family Code § 6700*.  This "right of disaffirmance"

explicitly states that "a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards or, . . . by the minor's heirs or personal representative." *Cal. Family Code § 6710*.  Disaffirmance "may be made by any act or declaration" indicating an intent to disaffirm.  *Celli v. Sports Car Club of Am., Inc.*, 29 Cal.App.3d 511, 517 (1972).  "No specific language is required to communicate an intent to disaffirm." *Berg v. Traylor*, 148 Cal.App.4th 809, 820 (2007).  The right to disaffirm reflects a policy of "shield[ing] minors from their lack of judgment and experience and confer[ing] upon them the right to avoid their contracts in order that they may be protected against their own improvidence and the designs and machinations of other people." *Sparks v. Sparks*, 101 Cal.App.2d 129, 137 (1950).

As set forth in the concurrently filed supporting declarations **[See, e.g., A.K., ¶ 6; M.W., ¶ 15; Declaration of J.G. ("J.G."), ¶ 7; C.M., ¶ 7; L.B., ¶ 10]**, to definitively resolve the claim that they agreed to the My AP Terms all of the Student Plaintiffs expressly disaffirm or will disaffirm the My AP Terms in their entirety and therefore, under California law, the My AP Terms are rendered a "nullity."  *Scollan v. Gov't Emps. Ins. Co.*, 222 Cal.App.2d 181, 183-84 (1963).  Accordingly, arbitration cannot be compelled against Student Plaintiffs under the My AP Terms.

### ii.       Student Plaintiffs did not agree to the My AP Terms.

Moreover, even absent this disaffirmance, there was no agreement to the My AP Terms.  Given the disaffirmance, Plaintiffs will only briefly address this subject as to the My AP Terms and incorporate by reference the arguments set forth later below, and in greater detail, on consideration, manifestation of assent, and unenforceability as they all apply at least equally to the My AP Terms as they do the AP Exam Terms.

The My AP Terms were entered into between the schools and College Board, with the student relegated merely an "end user."  **[Clewley Decl., ¶ 6 and Exh. "1"]**.  As the My AP Terms become effective once the school signs it, no acceptance was ever needed from a student and, in fact, no student acceptance existed if the student did not access the My AP website.  **[Clewley Decl., ¶ 6 and Exh. "1"]**.  For example, Plaintiff

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  L.B. registered for his exam by telephone, Plaintiff A.K. registered for his AP exam and
2  paid for his AP exam by paper prior to 2019, and Declarant A.S.'s school signed up for
3  the My AP Terms.  **[L.B., ¶ 2; A.K., ¶¶ 3-4; Declaration of A.S. ("A.S."), ¶ 5]**.

4          Mr. Clewley's declaration includes a photo of the My AP Terms as he asserts
5  they would have appeared to a user.  **[Clewley Decl., ¶ 6]**.  It is easy to see that students
6  were able to click a box stating "I have read and accept the terms of service" without
7  ever seeing a single word about arbitration or most of the actual terms.  This photo
8  shows that a student would encounter an agreement that was: (a) entered into on his or
9  her behalf by the school; (b) effective as of the date that College Board countersigned
10 the agreement; (c) gives no notice of arbitration; and (d) only applies to the AP
11 classroom and registration system – that is, the My AP Terms, as contrasted with the AP
12 Exam Terms, does not even state that it applies to the AP Exams at all.

13         Even if a student was inclined to scroll through the My AP Terms, a student
14 would have needed to scroll through nine pages to reach the seventeenth paragraph on
15 disputes (the "First Arbitration Clause"), which is notably not referenced in the table of
16 contents (the table of contents only indicates the existence of six paragraphs) **[Clewley**
17 **Decl., ¶ 6 and Exh. "1"]**, – and would have had to do so in only <u>five</u> minutes.  **[Miller**
18 **Decl., ¶ 22]**.  There is no hyperlink to the First Arbitration Clause at the front of the My
19 AP Terms and it is difficult to locate. **[Clewley Decl., ¶ 6 and Exh. "1"]**.  In fact, after
20 this Motion was filed, Student Plaintiffs were unable to even locate a copy of the My
21 AP Terms they allegedly signed.  **[N.C., ¶ 10; A.S., ¶ 18]**.

22         If College Board had intended to provide reasonable notice of the My AP Terms,
23 it should have: (a) sent them home before they were signed; (b) allotted more than five
24 minutes of class time for the students to read understand them before signing, (c) sent a
25 copy of the My AP Terms after they were signed, (d) made the My AP Terms easily
26 accessible on College Board's website for students or parents to locate, and (e) drafted
27 the terms so that student assent was necessary for the My AP Terms to be effective.
28 College Board did not do a single one of these things.

In sum, College Board cannot establish that Student Plaintiffs ever had notice of the My AP Terms or that they manifested any assent to the terms therein, let alone that they even needed to do so.  As such, was no notice or assent to the My AP Terms for any of the Student Plaintiffs and Plaintiffs now turn to the AP Exam Terms.

## C.    There Was No Agreement To The AP Exam Terms.

Simply put, no agreement to the AP Exam Terms generally, or to the Second Arbitration Clause specifically, was entered into by any of the Student Plaintiffs because the AP Exam Terms lacked consideration and there was no manifestation of assent.

### i.    The AP Exam Terms lack consideration.

Under California law, a bilateral contract is one in which there are mutual promises given in consideration of each other.  The promises of each party must be legally binding in order for them to be deemed consideration for each other.  If a party is not assuming a legal duty in making a promise, the agreement is not binding as a bilateral contract.  *Bleecher v. Conte*, 29 Cal.3d 345, 350 (1981).  "Without this mutuality of obligation, the agreement lacks consideration and no enforceable contract has been created."  *Mattei v. Hopper*, 51 Cal.2d 119, 122 (1958).  "An illusory promise is no promise at all and is not sufficient consideration for a return promise."  *Automatic Vending Co. v. Wisdom*, 182 Cal.App.2d 354, 357 (1960).  Here, the AP Exam Terms lack consideration in at least three respects.

First, the College Board incurs, quite literally, no obligations under the AP Exam Terms, whether in the Second Arbitration Clause or elsewhere.  **[See Rosner Decl., ¶ 18-20, 26]**.  Throughout the AP Exam Terms is clause after clause wherein the College Board reserves the ability to do both anything and nothing "in [its] sole discretion." **[See Rosner Decl., ¶¶ 31-35 and Exh. E]**.  Most egregious of all is perhaps Section 3(d), wherein the College Board reserves the right to, quite literally, throw out the test of the signing student if it deems there has been a "testing irregularity," a term which, of course, is solely at the discretion of the College Board to define as it wishes.  **[Clewley Decl., ¶ 13 and Exh. "2"; Rosner Decl., ¶¶ 31-35 and Exh. E]**.

Second, the Second Arbitration Clause requires a waiver of jury trial by Plaintiffs without any mutual waiver on the part of the College Board ("<u>you</u> are waiving <u>your</u> right to have <u>your</u> dispute heard by a judge or jury") and additionally grants the College Board access to class or collective action while denying it to Plaintiffs ("[n]o arbitration may be maintained as a class or collective action…without the express written consent of College Board").  **[Clewley Decl., ¶ 13 and Exh. "2"; Rosner Decl., ¶¶ 31-35 and Exh. E]**.  Moreover, such language strongly calls into question whether the phrase "[a]ll disputes between you and College Board" means disputes asserted by either the students or the College Board or, if in actuality, it was intended to be interpreted in keeping with the language of the First Arbitration Clause – i.e., "all student disputes <u>against</u> College Board."  **[Clewley Decl., ¶ 6 and Exh. "1"; Rosner Decl., ¶¶ 31-35 and Exh. E]**.  As such, even if the Court is only looking at the Second Arbitration Clause to determine if, internally, there is any consideration, it is apparent that there is none.

And third, even if the AP Exam Terms imposed a duty to test on College Board, such a "duty" was in-fact a legal obligation that the College Board already had and thus could not serve as consideration.  *Alaska Packers Ass'n. v Domenico*, 117 F. 99 (9th Cir. 1902) ("A promise by a party to do what he is bound in law to do is...is the same as no consideration at all, and is merely void).  The AP Exam is required by state law and by agreement between the school and College Board.  **[Miller Decl., ¶¶ 3-11]**.  In California alone there are at least ten statutes requiring schools – and the College Board by its relationships therewith – to provide Advanced Placement exams for various reasons.  **[Miller Decl., ¶¶ 4-12]**.  Thus, College Board incurred no new legal obligation by providing the AP Exams and thus there is no consideration for the AP Exam Terms or the Second Arbitration Clause.

### ii.    <u>There was no assent to the AP Exam Terms</u>.

To form a contract, there must be "[m]utual manifestation of assent, whether by written or spoken word or by conduct."  *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 29 (2nd Cir. 2002); however, "an offeree, regardless of apparent manifestation

of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* at 30. This standard applies with equal force to contracts formed over the Internet. *Long v. Provide Commerce, Inc.,* 245 Cal.App.4th 855, 862 (2016).

Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms. *Nguyen,* 763 F.3d at 1177. Whether a reasonably prudent user would be on inquiry notice turns on the "[c]larity and conspicuousness of arbitration terms." *Specht,* 306 F.3d at 30. Thus, only if the undisputed facts establish that there is "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms" will a contract have been formed. *Id.* at 35.

Electronic agreements fall along a spectrum in the degree to which they provide notice and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways. Consequently, courts must embark on a "fact-intensive inquiry" in order to make determinations about the existence of "[r]easonably conspicuous notice" in any given case. *Sugouros v. TransUnion Corp.*, 817 F.3d 1029, 1034-1035 (7th Cir. 2016); *Specht,* 306 F.3d at 35. At bottom, what is at stake is the "integrity and credibility" of "electronic bargaining." *Specht,* 306 F.3d at 35.

The purveyors of electronic formation contracts are legally required to take steps to provide consumers with "reasonable notice" of contractual terms. *Specht,* 306 F.3d at 28-29. User interfaces designed to encourage users to overlook contractual terms are hardly a suitable way to fulfill this legal mandate. As such, a court "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Sugouros,* 817 F.3d at 1035.

In this case, with one major variable, the AP Exam Terms fall into the "hybrid" agreement category, in that it required an affirmative act but the terms were provided to

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

the user through a hyperlink rather than on the same screen as the box and therefore leans heavily towards the "browsewrap" category of electronic agreements. *See Vernon v. Qwest Communications International, Inc.* (D. Colorado 2012); *Colgate v. Juul*, 428 F.Supp.3d 728, 763 (2019) ("[t]he defining feature of browsewrap agreements is the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists). The major variable here is, of course that students were restricted to thirty minutes or less to review the AP Exam Terms. This variable is critical and a significant distinction from other "hybrid" cases, as such cases were decided on the notion that the plaintiff was provided with an <u>opportunity</u> to review the terms of service. *Swift v. Zynga Game Networks, Inc.*, 805 F.Supp.2d 904. 912 (N.D. Cal. 2011). Here, due to the thirty-minute time limit, there was no real opportunity to review the over seventy pages of the Second Arbitration Clause, let alone the nearly two hundred pages of the AP Exam Terms. As such, there has been no reasonable notice of what the AP Exam Terms encompassed. Under circumstances such as these, then, the most apt description of the purported agreement at issue is perhaps a "time-restricted hybrid agreement."

For this reason, the time limit eliminates any notion of inquiry notice. Inquiry notice presumes there was actually time to <u>make</u> an inquiry – here, students did not have time to find and make their way through the nearly two hundred pages of the AP Exam Terms even if they had been able and inclined to try (and could not realistically reject the AP Exam Terms even if they did). **[Z.S., ¶ 5; D.K., ¶ 7, A.K. ¶ 5; M.W., ¶ 12; A.S., ¶¶ 20-21; C.M., ¶ 15; Lowe Decl., ¶¶ 3-6; Rosner Decl., ¶ 38]**.

The May 4, 2020 e-mail referenced in Mr. Clewley's declaration does not, as Defendants argue, mitigate the thirty-minute limitation for four separate reasons. First, the email was one of many that the College Board inundated students with prior to the at-home AP exams. **[D.K., ¶ 6; Declaration of R.P. ("R.P."), ¶ 3; N.C., ¶ 17]**. Second, the AP Exam Terms provide that the "College Board may update its policies and requirements from time to time and <u>they are subject to change</u> up to one week prior to

your test date.  <u>You are required to review these prior to each test administration</u>," such that reviewing them in advance of the test day would be futile. **[Clewley Decl., ¶ 13 and Exh. "2"]**.  Third, the "option" to review the unfinished AP Exam Terms was not mentioned until the very last sentence, in fine print, of the May 4, 2020 email.  There was no warning whatsoever in the May 4, 2020 email that warned students about the length, complexity, or legal consequences of the AP Exam Terms.  Indeed, reading the Terms of Service is not even listed as one of the "5 Steps to Get Ready." **[Clewley Decl., ¶ 10]**.  And lastly, Mr. Clewley's declaration provides no evidence that any Student Plaintiffs ever actually received or opened the May 4 e-mail, nor that it was even sent to a correct e-mail address for any of them.  For these reasons, it is clear College Board's May 4, 2020 e-mail did not constitute or provide reasonable notice.

### iii.   The AP Exam Terms were the result of "stealth" tactics.

In the world of electronic agreements on web-based platforms, contracts may not be formed through stealth tactics.  *Norcia v. Samsung Telecomms. Am., LLC*, 2014 WL 4652332 (N.D. Cal. 2014), *aff'd Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017).  As such, when the offeree does not know that a proposal has been made to him the objective standard does not apply. *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal.App. 3d 987, 992-93 (1972).

In this case, the AP Exam Terms were the result of such "stealth" tactics.  There can be no assumption that a reasonable (non-lawyer and minor) high school student was aware of the contents of the AP Exam Terms, especially when the hyperlink was preceded with multiple warnings such as not to leave the main test page, not to cheat, not to consult with anyone, and not to open other browsers. **[M.W., ¶ 13 and Exh. "A"]**.  The reasonable student would be forgiven for assuming that the hyperlink to the AP Exam Terms would contain items along these lines, not a waiver of their constitutional right to a jury trial or their right to pursue legal redress in court should the College Board violate the law. *See Schnabel*, 697 F.3d at 127-128.  This is particularly true given that many students, due to the complicated re-type, had so much trouble

logging on to the main page, that they were in a panic to reach the beginning of the AP Exam altogether.  **[Z.S., ¶ 5; D.K., ¶ 7; A.K., ¶ 5; M.W., ¶¶ 12-13]**.

Based on Plaintiffs' declarations, it appears as if College Board's stealth tactics were successful.  Students believed that, after reading an entire page of terms and conditions concerning cheating, plagiarism, intellectual property, and other matters they had already read College Board's terms and conditions prior to checking the box to continue to the AP Exam.  **[Z.S., ¶ 5; D.K., ¶ 7; M.W., ¶¶ 12-13; N.C., ¶ 15]**.

Had the students actually clicked on the hyperlink, despite a warning "never to leave their main browser" **[N.C., ¶ 15]**, they would have had to open nearly two hundred pages of legalese spread across numerous links, all to review within what was left of their thirty-minute window.  **[Lowe Decl., ¶¶ 3-6; Rosner Decl., ¶ 32]**.  Under ordinary circumstances, minor students at home may have wanted to consult with a trusted adult before entering into legal contracts that required them to forfeit educational rights; however, AP students were threatened not to consult with anyone during their AP Exams.  This threatened and forced isolation, coupled with hiding the AP Exam Terms within numerous hyperlinks, were all in furtherance of the College Board's stealth tactics and precluded students from knowing the proposal being made.

Defendants' thinly veiled notion that Student Plaintiffs agreed to the AP Exam Terms when they practiced on a demonstration site is further evidence of College Board's use of stealth tactics to prevent Student Plaintiffs from being properly notified of the proposal of arbitration.  Nonetheless, College Board has not presented evidence that anyone agreed to the AP Exam Terms through this demonstration.

### D. There Is No Enforceable Delegation Clause.

Unlike the arbitrability of claims in general, whether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  In this case, the plain language of the AP Exam Terms reflects that there is no delegation clause.

899-5656-0001

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

By its plain terms, the scope of the AP Exam Terms does not encompass "all disputes between you and College Board" as Defendants claim; rather, the actual scope is "all disputes between you and College Board <u>in accordance with Section 8</u>."  Section 8, in turn, limits the scope of encompassed disputes to those "that relate in any way to registering for or taking the AP Exam."  This in no way encompasses interpretation of arbitrability and certainly does not do so "clearly and unmistakably" as required.

Defendants alternatively argue that the mere reference to the AAA rules created a delegation clause; however, Defendants cite no legal authority for how mere reference to the AAA rules represents "clear and unmistakable" intent to delegate authority over arbitrability when an adhesive contract is imposed on an unsophisticated, minor consumer.  That is, minor high school students cannot be reasonably expected to know what arbitration is, let alone what the AAA does or the consequences of a delegation clause.  *See Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, *10-13.  As such, Defendants' argument that mere reference to the AAA rules is enough to create a "clear and unmistakable" delegation clause between itself and an unsophisticated minor is patently absurd and strains any semblance of credulity.

Even if a delegation clause is clear and unmistakable, it can nonetheless be unenforceable due to unconscionability.  *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016).  "[U]nconscionability has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000).  Both substantive and procedural unconscionability must be present in order for a court to find a contract unconscionable, but "they need not be present in the same degree."  *Id.*  Unconscionable contracts are those that are "so one-sided as to 'shock the conscience.'"  *Id.*

In this case, Defendants assert that two portions of the AP Exam Terms together constitute the delegation clause ("Delegation Clause"): (a) the initial statement that "[a]ll disputes between you and College Board will be resolved through binding

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1   arbitration in accordance with Section 8 of this Agreement" and (b) the reference and

2   incorporation of the AAA Arbitration Rules into the AP Exam Terms.  Since the alleged

3   Delegation Clause is unconscionable, it is unenforceable.

4         **i.**     **The alleged delegation clause is procedurally unconscionable.**

5        "Procedural unconscionability pertains to the making of the agreement; it focuses

6   on the oppression that arises from unequal bargaining power and the surprise to the

7   weaker party that results from hidden terms or the lack of informed choice."  *Ajamian v.*

8   *CantorCO2e, LP*, 203 Cal.App.4th 771, 795 (2012).

9        Where, as here, a contract of adhesion exists, "[p]rocedural unconscionability

10  focuses on the factors of surprise and oppression."  *Kilgore v. KeyBank, Nat. Ass'n*, 718

11  F.3d 1052, 1059 (9th Cir. 2013).  "'Oppression arises from an inequality of bargaining

12  power that results in no real negotiation and an absence of meaningful choice,' while

13  '[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in

14  a prolix printed form drafted by the party seeking to enforce them.'"  *Nagrampa v.*

15  *MailCoups, Inc.*, 469 F.3d 1257, 1280 (9th Cir. 2006).  Here, the alleged Delegation

16  Clause is procedurally unconscionable to a high degree in at least four respects.

17       First, all of the bargaining power was held by College Board because, quite

18  literally, the AP Exams are only provided by College Board.  **[A.S., ¶¶ 5-7, 11; D.K. ¶¶**

19  **3-5]**.  Even if the students possessed some modicum of bargaining ability because their

20  schools did not mandate taking the exams, they were not presented with the option to

21  negotiate the Delegation Clause (or any other part of the AP Exam Terms).  The terms

22  were presented on a "take it or leave it" basis" – that is, in order to take their AP Exams

23  students had to click the box or else walk away from the AP Exams.

24       Second, had students opted to reject the purported Delegation Clause and walk

25  away from the AP exam, the hundreds of hours spent on their AP classes would have

26  gone to waste **[A.S., ¶¶ 15, 20]** – a substantial deterrent to rejecting the Delegation

27  Clause even if they were aware of it.

28

Third, the circumstances underlying the presentation of the purported delegation clauses were oppressive because Plaintiffs had an extremely short time – thirty minutes **[R.P., ¶¶ 5-6; C.M., ¶¶ 4-5; A.S., ¶ 15, 20]** – within which to not only read and attempt to understand the Delegation Clause but to further make their decision.  As a point of comparison, in *Lima v. Gateway, Inc.*, 886 F.Supp.2d 1170, 1182 (C.D.Cal.2012) the court found <u>fifteen days</u> was considered so "short" a period of time so as to constitute procedural unconscionability.

And fourth, the factor of surprise is particularly high under these circumstances where the Delegation Clause is absurdly hidden.  To locate it, students were required to: (i) read the first page of the AP Exam Terms; (ii) trace the AP Exam Terms through to Section 8 to read and understand subsection (a); (iii) navigate to the AAA website; (iv) locate the AAA Consumer Arbitration Rules, (v) search through the AAA Consumer Arbitration Rules to find Rule 14, subsection (a), and (vi) then be able to decipher all of this to understand the existence, scope, and effect of the purported Delegation Clause.

### ii.     The alleged delegation clause is substantively unconscionable.

Under California law, an arbitration agreement is unconscionable if it does not contain at least a "modicum of bilaterality." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 998 (9th Cir. 2010).  For that reason, an arbitration agreement may be substantively unconscionable under California law where "it compels arbitration of the claims more likely to be brought by ... the weaker party but exempts from arbitration the types of claims that are more likely to be brought by [the stronger party]." *Fitz v. NCR Corp.*, 118 Cal.App.4th 702, 724 (2004).

In this case, the Delegation Clause is also substantively unconscionable.  The Delegation Clause contains a carve-out of the arbitrator's authority, requiring arbitration of all disputes between students and the College Board "that relate in any way to registering for or taking the AP Exam" <u>but</u> "excluding all claims that a party violated the intellectual property rights of the other party."  **[Rosner Decl., ¶¶ 31-35 and Exh. E]**.  Such a carve-out is substantively unconscionable due to lack of mutuality, as the

899-5656-0001

- 20 -

College Board could bring a claim against a student for misuse of its intellectual property outside of the arbitration forum.  **[Clewley Decl., ¶ 13 and Exh. "2"]**.

Thus, by delegating all disputes relating to the AP Exam to the arbitrator, but then creating an exception to that delegation for intellectual property disputes, the College Board is forcing the students to arbitrate their claims while "reserving the courtroom for itself."  This constitutes substantive unconscionability where, as here, the agreement does not set forth any justification for why intellectual property rights should be carved out.  See, e.g., *Mitchell v. HCL America, Inc.*, 190 F.Supp.3d 477, 492 (E.D.N.C. 2016); *Grabowski v. Robinson*, 817 F.Supp.2d 1159 (S.D.Cal. 2011).  Accordingly, even if the Delegation Clause exists, it is unconscionable and thus unenforceable.

### E.     The AP Exam Terms Are Unenforceable.

In determining whether a party has agreed to arbitrate, federal courts apply ordinary state-law principles governing the formation of contracts.  *First Options of Chic, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995).  As such, California law determines whether contract defenses such as unconscionability or undue influence might apply to any purported agreement to arbitrate the dispute in question.  *Capili v. Finish Line, Inc.*, 116 F.Supp.3d 1000, 1004-1006 (N.D.Cal. 2015).

### i.     The AP Exam Terms are void against public policy.

Under California law, any arbitration agreement that prevents the award of public injunctive relief in any forum is unenforceable.  *McGill v. Citibank NA*, 2 Cal.5th 945, 961 (2017).  This includes contracts that compel all claims to arbitration but allow only pursuit of individual relief (solely on behalf of oneself) in that forum.  *Id*.  Indeed, a California federal judge recently rescinded her prior decision sending a proposed class action challenging U.S. Banks' fees to arbitration, finding that the arbitration provision was invalid in light of the Ninth Circuit's recent rulings that clarify the state high court's *McGill* precedent.  *McGovern v. U.S. Bank N.A.*, 2020 WL 4582687, *1-2.

In this case, Sections 3d and 9 of the AP Exam Terms purport to expressly limit the available remedy available to aggrieved students to nothing more than the

registration fee.  **[Clewley Decl., ¶ 13 and Exh. "2"]**.  By so limiting the available remedy, the Second Arbitration Clause excludes the ability to seek public injunctive relief and is therefore void and unenforceable under California law.

### ii.    The AP Exam Terms are procedurally unconscionable.

The procedural circumstances surrounding the AP Exam Terms as a whole are similar to the circumstances surrounding the Delegation Clause, only amplified by an order of magnitude.  In addition to lacking any ability to negotiate or reject the AP Exam Terms for the reasons previously stated, the thirty minute restriction becomes even more onerous and procedurally unconscionable because students had to find both the Delegation Clause and all the other parts of the Second Arbitration Clause – scattered among forty-five pages of the AAA Rules and thirty-three pages of the AAA Consumer Due Process Protocol.  This was in addition to the arbitration language contained in Section 8 of the AP Exam Terms.  [**Clewley Decl., ¶ 13 and Exh. "2";** **[Rosner Decl., ¶¶ 31-35 and Exh. E]**.

Similarly, the difficulty is amplified significantly because all of the arbitration language, not merely the Delegation Clause, required students to navigate away from the main page of the AP Exam to go on a digital scavenger hunt – i.e., explore the AAA website to locate both the AAA Rules and AAA Consumer Due Process Protocol. **[Clewley Decl., ¶ 13 and Exh. "2"; [Rosner Decl., ¶¶ 31-35 and Exh. E]**.  Yet students were reasonably reluctant to do so because they feared leaving the browser would result in an accusation of cheating.  **[N.C., ¶ 13; A.S., ¶ 21]**.

### iii.    The AP Exam Terms are substantively unconscionable.

The substantive unconscionability of the Second Arbitration Clause permeates the alleged agreement in at least four respects.  First, the Second Arbitration Clause impermissibly attempts to force students to arbitrate their claims relating to the AP Exam while "reserving the courtroom for itself" when it comes to the matters the College Board anticipates needing to initiate litigation – i.e., disputes over intellectual property.  **[Clewley Decl., ¶ 13 and Exh. "2"; [Rosner Decl., ¶¶ 31-35 and Exh. E]**.

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

Second, the Second Arbitration Clause seeks to impose significant costs on students by requiring that they pay for their "fees and expenses" in connection with the arbitration, fees and expenses which they would largely not have to pay were this matter to proceed in civil court.  [**Clewley Decl., ¶ 13 and Exh. "2"; [Rosner Decl., ¶¶ 31-35 and Exh. E**].  Indeed, such a clause runs directly contrary to the AAA Due Process Protocols, which state as Principle 6 that "[p]roviders of goods and services should develop ADR programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process."  [**Lowe Decl., ¶ 3-4 and Exh. "A"**].  Importantly, the comments to Principle 6 emphasize that "[a] fundamental principle of our civil justice system is that a person should never be denied access to a court due to an inability to pay court costs."  Yet that is precisely what the College Board seeks to do by attempting to force students to pay for arbitration.  *See, e.g., Gutierrez v. Carter Bros. Sec. Services, LLC*, 63 F.Supp.3d 1206 (E.D.Cal. 2014).

Third, the Second Arbitration Agreement grossly lacks mutuality in that it forces students to waive their right to a jury ("you are waiving your right to have your dispute heard by a judge or jury") without the College Board waiving the same rights.  [**Clewley Decl., ¶ 13 and Exh. "2"**].  And fourth, College Board, who had far greater bargaining power, prescribed terms that prevented students from receiving any real damages – that is, the Second Arbitration Clause purports to limit the recovery in arbitration to nothing more than the registration fee or $100.  [**Clewley Decl., ¶ 13 and Exh. "2"**].

### iv.    The AP Exam Terms were presented through undue influence.

The AP Exam Terms are also unenforceable because any alleged agreement was the result of undue influence.  As described above, students had literally no bargaining power with the College Board and were entirely at its mercy.  Such circumstances invalidate the Second Arbitration Clause on the grounds of undue influence.

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

"Undue influence ... is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment." *Odorizzi v. Bloomfield School Dist.*, 246 Cal.App.2d 123, 130 (1966). "In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object." *Id*. at 131. "In combination, the elements of *undue susceptibility* in the servient person and *excessive pressure* by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person." *Id.* (emphasis added). The elements of "excessive force" and "undue susceptibility" are symbiotic, because a greater quantity of one may compensate for a lesser quantity of the other. "Undue influence involves a type of mismatch which our statute calls unfair advantage." *Id*. at 132.

In this case, by isolating students, putting them on a thirty minute clock, and threatening to destroy their year of hard work by blocking them from the AP Exams if they did not click the box next to the hyperlink to the AP Exam Terms **[Z.S., ¶ 6; A.K., ¶ 5; C.M., ¶ 11; D.K., ¶ 7; M.W., ¶ 12, R.P., ¶ 5]**, Defendants discussed the lengthy AP Exam Terms in an "unusual or inappropriate time," consummated "the transaction in an unusual place," insisted "that the business be finished at once," placed "extreme emphasis on untoward consequences of delay," and warned "that there is no time to consult financial advisers or attorneys," all of which constitute excessive persuasion and pressure. *Id*. at 133. Under these circumstances, students were also unduly susceptible to this persuasion and pressure in view of their "age, physical condition, emotional anguish or a combination of such factors…[leading to] a weakness of spirit." *Id*. at 131. As such, withholding access to the AP Exams absent on-the-spot acceptance of the AP Exam Terms constitutes undue influence and the AP Exam Terms are unenforceable.

### F.    Mr. Clewley's Testimony is Disputed by Plaintiffs.

Finally, Mr. Clewley's testimony is disputed. First, College Board's own website published data admitting that 1.1 million students did not complete the AP Exams

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**

despite signing up.  These students were either not presented with the AP Exam Terms or did not receive the benefit of the AP Exam Terms because they were not able to complete the AP Exam[5].  **[Miller Decl., ¶ 14]**.  And second, as discussed herein, Mr. Clewley's testimony does not address or is contradicted by the supporting declarations submitted by Plaintiffs in a number of respects.  **[See, e.g., A.K., ¶ 3; L.B., ¶ 5]**.

Accordingly, in the event the Court is inclined to order arbitration for any of the Plaintiffs, there should be an evidentiary hearing to settle the factual dispute of whether those Plaintiffs agreed to arbitration.  *See, e.g., Campos v. Bluestem Brands, Inc., 2015 WL 5737601*, at *11 (Dist. Ct. Oregon, 2015) ["this dispute involves the credibility of the parties, which the Court cannot determine based on the evidence thus far submitted. Therefore, before ruling on…[the] motion [to compel arbitration], an evidentiary hearing must be held to determine whether a valid arbitration agreement exists"].

## 4.    CONCLUSION.

Under the law, there was no agreement to arbitrate.  Alternatively, any such agreement is utterly unenforceable.  Accordingly, Plaintiffs respectfully request that the Motion be denied in its entirety.

DATED: September 30, 2020                BAKER, KEENER & NAHRA, LLP

By  */s/ PHILLIP A. BAKER*
PHILLIP A. BAKER
DERRICK S. LOWE
JENNIFER S. STONE

MILLER ADVOCACY GROUP

By  */s/ MARCI LERNER MILLER*
MARCI LERNER MILLER
CHRISTINA N. HOFFMAN
Attorneys for Plaintiffs

---

[5] College Board AP Exam Overview: https://apcentral.collegeboard.org/pdf/2020-ap-exam-data-overview.pdf

899-5656-0001

- 25 -

**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION**